In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-02-00131-CV
______________________________


ESTATE OF BESSIE MAE BIRDWELL, DECEASED,
BY AND THROUGH ITS INDEPENDENT ADMINISTRATOR,
DAVID W. BIRDWELL, AND
DAVID W. BIRDWELL, INDIVIDUALLY, Appellants
 
V.
 
TEXARKANA MEMORIAL HOSPITAL, INC.,
d/b/a WADLEY REGIONAL MEDICAL CENTER, Appellee


                                              

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 00C0917-202


                                                 



Before Ross, Carter, and Hadden,* JJ.
Opinion by Justice Ross
*Roby Hadden, J., Sitting by Assignment


O P I N I O N

          The Estate of Bessie Mae Birdwell, Deceased, by and through its independent
administrator, David W. Birdwell, and David W. Birdwell, Individually, (the Estate) appeals
the trial court's dismissal of their suit against Texarkana Memorial Hospital, d/b/a Wadley
Regional Medical Center (Wadley), for the Estate's alleged failure to meet the expert report
requirements set out in the former Medical Liability and Insurance Improvement Act. See
Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01 (Vernon Supp. 2003).


 
Factual and Procedural Background

          Birdwell was hospitalized at Wadley June 11, 1998, with multiple medical problems,
including a blood clot and pulmonary embolism. She had a relatively uneventful hospital
stay, until June 16, 1998, when she was found on the floor of her hospital room. 
Malcolm A. Smith, M.D., examined her and treated her for a skin tear and a small
hematoma on the right side of her head, then discharged her from the hospital. Later that
day, Birdwell developed a significant change in her mental status and was brought back
to Wadley. She was given a CT scan and diagnosed with multiple intracranial
hemorrhages. She remained paralyzed on her left side and in a diminished level of
consciousness. She was discharged from the hospital September 21, 1998. She died
January 29, 1999. 
          The Estate sued Wadley, Smith, and Collom & Carney Clinic Association for
negligence and wrongful death. The Estate timely filed the expert report and curriculum
vitae of Marsha E. Thigpen, M.D., as required by the Medical Liability and Insurance
Improvement Act. Smith and Collom & Carney moved to strike the expert's report and
dismiss the case against them with prejudice. The trial court granted the motion; no appeal
was taken against those defendants. Wadley then moved to strike the expert's report and
dismiss the case against it with prejudice. The trial court held a hearing and granted the
motion. The Estate appeals, contending the trial court abused its discretion in determining
the expert report it provided did not meet the requirements of the Medical Liability and
Insurance Improvement Act. 
Standard of Review 
          Dismissal of a cause of action under Article 4590i, Section 13.01 is treated as a
sanction and is reviewed for an abuse of discretion. See Am. Transitional Care Ctrs. v.
Palacios, 46 S.W.3d 873, 877 (Tex. 2001). An abuse of discretion occurs when a trial
court acts in an arbitrary or unreasonable manner or without reference to any guiding
principles. See Garcia v. Martinez, 988 S.W.2d 219, 222 (Tex. 1999). A trial court does
not abuse its discretion simply because it may decide a matter within its discretion
differently than an appellate court. Downer v. Aquamarine Operators, Inc., 701 S.W.2d
238, 242 (Tex. 1985). However, a trial court has no discretion in determining what the law
is or in applying the law to the facts. Thus, "a clear failure by the trial court to analyze or
apply the law correctly will constitute an abuse of discretion, . . . ." Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992).
Expert Report Requirements 
          Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(d) requires a plaintiff asserting a
healthcare liability claim to submit an expert report, along with the expert's curriculum vitae,
as to each physician or healthcare provider named as a defendant in the suit, no later than
the 180th day after filing suit. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(d). The
Act describes an expert report as a written report providing "a fair summary of the expert's
opinions . . . regarding applicable standards of care, the manner in which the care rendered
by the physician or health care provider failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages claimed." Tex. Rev. Civ.
Stat. Ann. art. 4590i, § 13.01(r)(6).
          If a claimant furnishes a report within the time permitted, a defendant may file a
motion challenging the report. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l). The
trial court shall grant the motion only if it appears to the court, after a hearing, that the
report does not represent a good faith effort to comply with the statutory definition of an
expert report. See id.; Palacios, 46 S.W.3d at 877–78.
          If a report omits any of the statutory elements, it cannot be a good faith effort. 
Palacios, 46 S.W.3d at 879. A report that merely states the expert's conclusions about the
standard of care, breach, and causation is not sufficient. Id. In determining whether the
report represents a good faith effort, the trial court's inquiry is limited to the four corners of
the report. Id. at 878.
          The expert report must set forth an applicable standard of care and a breach of that
standard. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6). The standard of care for a
hospital is what an ordinarily prudent hospital would do under the same or similar
circumstances. Palacios, 46 S.W.3d at 880. Identifying the standard of care is critical: 
whether a defendant breached its duty to a patient cannot be determined absent specific
information about what the defendant should have done differently. Id. "While a 'fair
summary' is something less than a full statement of the applicable standard of care and
how it was breached, even a fair summary must set out what care was expected, but not
given." Id.
          The expert's report must also contain information on causation. It is not enough for
a report to contain conclusory insights about the plaintiff's claims. Bowie Mem'l Hosp. v.
Wright, 79 S.W.3d 48, 52 (Tex. 2002). Rather, the expert must explain the bases of the
statements and link the expert's conclusions to the facts. Id. (citing Earle v. Ratliff, 998
S.W.2d 882, 890 (Tex. 1999)).
Analysis 
          The Estate presented an expert report in letter form. Thigpen's letter, in its entirety,
states:
After careful review of the clinic notes, hospital records, etc. on the above
referenced patient, I offer the following observations. I reviewed Collom &
Carney Clinic records and records from Wadley Regional Medical Center
from April 15, 1998 through September 21, 1998. Based upon reasonable
medical probabilities, it is my opinion that the nurses at Wadley and
Dr. Malcolm Smith deviated from the appropriate standard of care while
treating Bessie Birdwell and that this deviation from the appropriate standard
of care was a cause of Ms. Birdwell's injuries suffered on June 16, 1998 as
more fully explained. 
 
The patient was an elderly female with multiple medical problems, including
but not limited to multiple Transient Ischemic Attacks, Cerebrovascular
Accident with resultant Seizure Disorder. Mrs. Birdwell developed another
temporal bleed while on Coumadin in May 1998 and the Coumadin was
stopped. Approximately one month later (hospitalization from 6/11/98 -6/16/98), the patient developed a Deep Venous Thrombosis and Pulmonary
Embolism. With the history of previous bleeds being contraindication to
systemic Heparin, Mrs. Birdwelll received subcutaneous Heparin. A
Greenfield filter was then placed to prevent further emboli.
 
The records indicate that Mrs. Birdwell had a relatively uneventful hospital
course until the last few days of her stay. Multiple entries indicate the
patient's confusion, disorientation and inability to learn safety procedures. 
During the last 48 hours of the 6/11/98 - 6/16/98 admission, the nurse's
notes indicate the patient was found on the side of the bed on one occasion,
and on the floor on another. The second occasion, the patient was face
down on the floor, appearing stunned, and initially nonverbal. The attending
physician was notified of this accident. The attending physician
acknowledged the fall and the resultant 5 x 5 cm hematoma during his
examination of the patient on 6/16/98. Although no detailed neurological
examination was documented, the attending physician did state there was
"no other evidence of trauma from fall" (the nurse's notes did indicate a
finger skin tear). The attending physician's discharge instructions included
continued subcutaneous Heparin and "ice to scalp PRN". No diagnostic
studies appear to have been ordered. The hospital's discharge instructions
did not appear to include head injury precautions. The patient was
discharged at 12:52 PM on June 16, 1998.
 
Mrs. Birdwell later the same day developed a significant change in mental
status and was brought to the Emergency Room (at 21:39 PM) for
evaluation. The patient was then re-admitted. Work up at that time included
a CT Scan of the head, which revealed: 1) multiple intracerebral areas of
hemorrhage with a small amount of subarachnoid blood. 2) probable old
infarct of the right cortical region of the parietal lobe. 3) encephalomalacia
in the left temporal lobe due to previous hemorrhage. Further work up
included a CT Scan of the neck, which revealed: 1) intramuscular hematoma
involving the right sternocleidomastoid (consistent with trauma). Several
physicians during this hospital stay documented the etiology of the current
multiple hemorrhages as "probably post-traumatic". 
 
As a result of the fall and multiple intracranial hemorrhages, the patient was
left obtunded and with a left hemiplegia. Mrs. Birdwell later developed
Aspiration Pneumonia, ultimately requiring Endotracheal Intubation, and later
tracheotomy. The patient also required a permanent feeding tube for
nutritional support. Neurologically the patient showed some improvement
prior to her discharge on 09/21/98.
 
With regard to the fall, it appears that some measures were taken to attempt
to educate the patient regarding safety and to prevent falls. I have also
reviewed the Wadley Regional Medical Center's Practice Guideline: Fall
Precautions, and policy on use of restraints. The policy clearly states the
standard of care is: "The patient will be provided an environment that is safe
so that the patient is protected from injury during his/her hospital stay." The
use of restraints is clearly outlined in the details of the policy. The patient's
documented confusion, and inability to be taught, indicates a need for
additional protection. The failure to provide this protection for Mrs. Birdwell
was clearly below the medical center's own standard of care. Had additional
measures been taken, the fall more likely than not could have been
prevented. Due to the patient's documented history of Cerebral Bleeds, and
the fact that the patient was receiving subcutaneous Heparin, it would have
been prudent and within the standard of care to obtain a head CT Scan prior
to discharge on 6/16/98. The attending physician did document that the
patient had no evidence of trauma from the fall (other than a small
hematoma). However, documentation of a thorough neurological
examination would have been helpful. 
 
It is evident from the documentation that the patient's debilitated condition as
a result of the fall contributed to some of the adverse events late in the
hospital course. 
 
          To comply with the expert report requirement, a plaintiff must only make a good faith
attempt to provide a fair summary of the expert's opinions. Tex. Rev. Civ. Stat. Ann. art.
4590i, § 13.01(l); Palacios, 46 S.W.3d at 875. To constitute a good faith effort, the report
must discuss the standard of care, breach, and causation with sufficient specificity to
inform the defendant of the conduct the plaintiff has called into question, and to provide a
basis for the trial court to conclude that the claims have merit. Palacios, 46 S.W.3d at 875.
          Thigpen's report states her opinions concerning the standard of care, the breach,
and causation in these particulars:
Standard of Care:
[T]he Wadley Regional Medical Center's Practice Guideline: Fall
Precautions, and policy on use of restraints. The policy clearly states the
standard of care is: "The patient will be provided an environment that is safe
so that the patient is protected from injury during his/her hospital stay." The
use of restraints is clearly outlined in the details of the policy. The patient's
documented confusion, and inability to be taught, indicates a need for
additional protection.
  
Breach:
 
The failure to provide this protection for Mrs. Birdwell was clearly below the
medical center's own standard of care.

Causation:
 
As a result of the fall and multiple intracranial hemorrhages, the patient was
left obtunded and with a left hemiplegia. . . . Had additional measures been
taken, the fall more likely than not could have been prevented. . . . It is
evident from the documentation that the patient's debilitated condition as a
result of the fall contributed to some of the adverse events late in the hospital
course. 
 
          We find the report is a good faith attempt to give a fair summary of the standard of
care, the hospital's breach, and the injuries Birdwell suffered as a result of that breach. 
While the report does not provide a direct statement that the standard of care required the
hospital to use restraints, that the hospital breached that standard of care by failing to use
restraints, and that Birdwell's injuries were caused by that breach, the substance of
Thigpen's report provided the hospital with fair notice of all those required elements. Magic
words are not always used, but magical words are not necessary. Wright, 79 S.W.3d at
53. It is the substance of the opinions, not the technical words used, that constitutes
compliance with the statute. Moore v. Sutherland, 107 S.W.3d 786, 790 (Tex.
App.—Texarkana 2003, pet. denied). The substance of Thigpen's report gave fair notice
to the hospital of (1) the standard of care, i.e., the standard of providing restraints to ensure
an environment that is safe so that the patient is protected from injury; (2) what the hospital
did wrong, i.e., the failure to provide restraints; and (3) the cause of Birdwell's hemorrhages
and paralysis, i.e., her fall as a result of the failure to provide restraints as an additional fall
precaution.
          The expert report need not present evidence as if it were litigating the merits of the
case. It may be informal, and the information presented need not meet the same
requirements as evidence offered in a summary judgment proceeding or in a trial. 
Palacios, 46 S.W.3d at 879.
          Wadley contends Palacios and Wright support its position that Thigpen's report is
inadequate. In Palacios, however, there was no statement whatsoever in the expert report
as to what the standard of care was. There was only a statement that the medical care
rendered to Palacios was below the accepted and expected standard of care. Here,
Thigpen's report stated a standard of care which provided the hospital and trial court with
information as to what the hospital specifically failed to do. That report provides that "[t]he
policy clearly states the standard of care is: The patient will be provided an environment
that is safe so that the patient is protected from injury during his/her hospital stay," and
specifically states that "[t]he use of restraints is clearly outlined in the details of the policy." 
("The policy" referenced is clearly the Wadley Regional Medical Center's Practice
Guideline: Fall Precautions, and the policy on use of restraints.) Thigpen's report does not
use the magic words "standard of care" and the words "use of restraints" in the same
sentence, but the substance of the report provides a fair summary of the expert's opinion
that the standard of care specifically required Wadley to use restraints in Birdwell's
situation, and its failure to do so was a breach of that standard of care. See Moore, 107
S.W.3d at 790-91 (finding substance of expert's opinion gave fair notice to doctor and
hospital that standard of care required them to make diagnostic evaluation for bile
peritonitis). Therefore, the substance of Thigpen's report provides what the report in
Palacios did not: a statement of what the hospital specifically failed to do. 
          In Wright, the Texas Supreme Court held that the expert report gave a fair summary
of the standard of care and the breach of that standard, but held that the report did not
fairly summarize causation because it was merely conclusory. Wright sustained injuries
in a car accident. Wright, 79 S.W.3d at 50. While Wright was at the hospital, a physician's
assistant x-rayed her right knee and foot, and diagnosed her with a fractured kneecap. Id. 
The physician's assistant, however, allegedly misplaced or misread the foot x-ray and did
not discover that Wright had also fractured her right foot in the accident. Id. Nearly a
month after the accident, Wright's orthopedic surgeon discovered her fractured foot. Id. 
By that time, the surgeon had already operated on her knee. Id. The Wrights claimed the
surgeon could have operated on her foot at the same time as her knee had he known
about the injury, but instead Wright had two additional surgeries over the next ten months. 
Id. The statement of causation in the expert report provided by the Wrights stated that, "if
the x-rays would have been correctly read and the appropriate medical personnel acted
upon those findings then Wright would have had the possibility of a better outcome." Id.
at 51. As noted by the Texas Supreme Court, this statement did not summarize the causal
relationship between the hospital's failure to meet the standard of care and the patient's
injury because "the report simply opines that [Wright] might have had 'the possibility of a
better outcome' without explaining how [the hospital's] conduct caused injury to [her]." Id.
at 53. The court found the report lacked information linking the expert's conclusion (that
the patient might have had a better outcome) to the hospital's alleged breach (that it did
not correctly read and act on the x-rays) and, therefore, the trial court could have
reasonably determined the report was conclusory. Id. 
          In Thigpen's report, however, Wadley's alleged negligence in failing to provide
restraints was linked to Birdwell's hemorrhages and left side paralysis. Wadley contends
the statement in Thigpen's report, "[h]ad additional measures been taken, the fall more
likely than not could have been prevented," does not address causation since it does not
link any failure to meet the applicable standard of care to Birdwell's alleged injuries. 
Wadley argues, therefore, this statement, like the one in Wright, is conclusory as to how
Wadley breached the standard of care and as to how that breach then caused injuries to
Birdwell. As discussed above, the substance of Thigpen's report was that Wadley
breached the standard of care by not providing restraints. The report provides that, had
Wadley not breached the standard of care, Birdwell's fall "more likely than not" could have
been prevented.


 In addition, the report provides a link between Wadley's negligence and
Birdwell's specific injuries where it states that "[a]s a result of the fall and multiple
intracranial hemorrhages, the patient was left obtunded and with a left hemiplegia." 
          This report specifically states what Wadley should have done and what happened
because it failed to do it. The statement of causation is not a conclusion or a statement
of a mere possibility, as in Wright, but is a positive statement of fact: Had Wadley used
restraints as an additional fall protection, it is more likely than not Birdwell would not have
fallen and suffered intracranial hemorrhages and a left-sided paralysis. See Moore, 107
S.W.3d at 790-91 (finding causation statement in expert report that provided "[h]ad the
diagnosis of bile peritonitis been made before discharge from the hospital, treatment would
have prevented the patient's death," was not conclusion, but positive statement of fact).
Conclusion  
          We find the expert's report gave Wadley fair notice of what Thigpen considers the
standard of care, how Wadley breached that standard, and how that breach caused
Birdwell's injuries. We therefore reverse the judgment and remand the case to the trial
court for further proceedings consistent with this opinion. 
 

                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      December 4, 2003
Date Decided:         December 12, 2003